UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

UNITED STATES OF AMERICA       )
                               )   Case No. 1:09-cr-187
v.                             )
                               )   *Collier / Lee*
ABRAHAM A. AUGUSTIN            )

**REPORT AND RECOMMENDATION**

Before the Court is the motion of Defendant Abraham A. Augustin ("Defendant") to suppress evidence obtained by the Government after it received information from Defendant's post-indictment cellmate [Doc. 39].[1] After considering the evidence and argument, I find no constitutional violation, and I **RECOMMEND** Defendant's motion to suppress be **DENIED**.

**I.     BACKGROUND**

   **A.     Agent Jackson**

The Government offered the testimony of Wayne Jackson ("Jackson"), a Special Agent with the Federal Bureau of Investigations, who is the case agent responsible for Defendant's investigation. Jackson was initially confused about certain details of his testimony, but after he consulted his notes, his testimony was consistent with the documentary evidence and other credible evidence. Jackson testified as follows: In early December, 2009, Defendant arranged to purchase

---

[1] The motion was referred for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) [Doc. 41]. The Government filed a response in opposition [Doc. 48] and an evidentiary hearing was held on May 13, 2010. Both sides filed post-hearing briefs [Doc. 59, 60]. The matter is now ripe for decision.

drugs through Robert Jordan ("Jordan") and Curtis Smith ("C. Smith"). When those drugs turned out to be fake, Defendant and his co-defendant, Lorrance Dais ("Dais"), arranged to meet Jordan and C. Smith. They kidnapped Jordan and held him for ransom, using C. Smith's cell phone to call Jordan's mother to arrange the ransom exchange. Jordan's mother contacted police, and Defendant was located and arrested on state kidnapping and armed robbery charges.

Defendant made bond on the state charges, and he was thereafter arrested on a criminal complaint on federal charges of kidnapping, possession of a firearm in furtherance of kidnapping, and possession of a firearm by a felon. Defendant was placed in federal custody at the Bradley County jail. Defendant was subsequently indicted on the same three charges alleged in the criminal complaint.

On January 4, 2010, Jackson received word from a detective with the Bradley County Sheriff's Office, Carl Maskew ("Maskew"), that an inmate, Mark Anthony Gibson ("Gibson"), had information about Defendant's case. Jackson did not know how Maskew had received word from Gibson. Jackson described Gibson as a state prisoner serving a probation violation resulting from a driving violation. Jackson and Maskew interviewed Gibson the next day, January 5. Prior to January 5, Jackson had never met or spoken with Gibson. Jackson did not know whether Gibson was housed in the same cell as Defendant or simply shared a common area with him. To Jackson's knowledge, Gibson was not acting under orders from any law enforcement officers to obtain information from Defendant.

During the January 5 interview, Gibson told the officers that Defendant had been talking to him about Defendant's involvement in drug trafficking, the drug deal gone bad and resulting kidnapping, and that Defendant was looking for someone to "eliminate" witnesses. Gibson told

2

Jackson that Defendant had written a letter to Ashleih Hall ("Hall"), which Gibson had read, and that Defendant planned to mail the letter that day or the next. Gibson said the letter was basically a confession to the kidnapping. During the interview, Gibson also told Jackson that Defendant had been using Gibson's personal identification number ("PIN")[2] to make phone calls undetected. Gibson said after he saw the letter he became concerned that somebody was going to get hurt or killed if the letter got out and that he was not asking law enforcement for any help in return. Gibson also told Jackson that he (Gibson) "went along" with the plan to eliminate witnesses and gave Defendant the name of someone he thought could help Defendant. Gibson explained to Jackson, that his intent in giving Defendant that name was only to help law enforcement.

Jackson requested that officials at the jail intercept the letter to Hall, but they were too late to do so. Jackson did not know how to find Hall at that time. However, by listening to calls made by Defendant on Gibson's PIN, which included a call to Hall, Jackson was able to locate Hall at her place of employment on January 7, 2010. Hall had not yet received any letters from Defendant. Jackson accompanied Hall home, where they retrieved correspondence from Defendant to Hall that was still in Hall's mailbox.[3] In a single envelope were two letters, one to Hall and another to Justine Van Orden ("Van Orden").[4]

In the letter to Hall, Defendant instructed Hall not to read the letter to Van Orden, but to forward it to another address. In the letter to Van Orden, Defendant stated he was willing to pay

---

[2] Each inmate at the Bradley County jail is given a PIN which must be used to make phone calls. Inmate phone calls are recorded.

[3] Defendant offered Hall's testimony, which need not be summarized herein as it was consistent with Jackson's account on all relevant topics.

[4] The letters were admitted as Government Exhibits 1 and 2.

"double" the going rate for a "hit" on three "witnesses": Jordan, whom Defendant referred to as "the one we snatched," Jordan's mother, and C. Smith. Defendant asked Van Orden to contact a member of the Bloods gang named Terrence Smith ("T. Smith") to arrange the hit.

At some time after the January 5 interview, Jackson considered having Gibson "wired up" to record further conversations with Defendant. Jackson did not do so because by the time he considered it, Defendant had stopped talking to Gibson because he suspected Gibson was cooperating with law enforcement. There was a conflict of some sort between Defendant and Gibson after January 5, and the two men were placed in separate cells. Jackson had no contact with Gibson after the January 5 interview. Consistent with Jackson's testimony, Defendant wrote another letter to Hall in which he stated he knew that Gibson was "working with the police" and asking Hall to warn Van Orden not to contact T. Smith.[5]

**B.     Agent Maskew**

Maskew, who in addition to being a detective with the sheriff's office is assigned to the Bureau of Alcohol, Tobacco, Firearms and Explosives as a federal investigator, testified for the Government as follows: Maskew corroborated Jackson's testimony with respect to the interview of Gibson. Maskew was aware that Defendant was represented by counsel on the federal charges alleged in the original indictment throughout the relevant time period. Maskew received a communication that Gibson had information about Defendant. Maskew had not met Gibson

---

[5] This second letter was admitted without objection as Defendant's Exhibit 1. It is undated, but indicates Defendant believed Hall would receive the second letter before Van Orden received the letter Hall had been instructed to forward. A third letter to Hall, postmarked January 11, was admitted as Defendant's Exhibit 2. That third letter asks Hall to "remind" Van Orden not to contact T. Smith. The third letter also warns Hall that if she deceives Defendant, he will have her killed from inside the jail.

4

beforehand and was not aware of any prior interviews between Gibson and other law enforcement officers. Maskew set up the January 5 interview with Gibson and Jackson. At the conclusion of the interview, Maskew and Jackson advised Gibson to keep his eyes and ears open, but to refrain from eliciting any information from Defendant. Maskew testified he had no further contact with Gibson after the January 5 interview.

Maskew did not recall receiving a note from Defendant after the January 5 interview. Defendant introduced a note from Gibson to Maskew in which Gibson states, "I've continued to observe and monitor [Defendant's] actions, messages and communications with other inmates."[6] Gibson's note also states that although he "let [Defendant] slip away," he felt it was his "duty to find another avenue to accomplish our mission." Maskew testified he assumed the "mission" referred to by Gibson in the note was "to observe."

### C. Cellmate Gibson

The Government also called Gibson as a witness and he testified as follows: Gibson, a self-described criminal, was Defendant's cellmate from mid December, 2009, through early January, 2010. He did not know why he was assigned to Defendant's cell, but he assumed it was a "random" assignment. Gibson denied he wanted any "help" from law enforcement in return for his cooperation, stating he was only serving a short five-and-one-half month sentence and did not need any help.

Gibson and Defendant started conversing because Gibson has children around the same age as Defendant and Defendant knew of his children. The conversations started with discussions about

---

[6] The note was admitted without objection as Defendant's Exhibit 3.

investing money and grew to discussions about the elimination of witnesses. Gibson explained that he gave Defendant his PIN but then heard of conversations that worried him, so he reflexively decided to try to cover himself by reporting his observations to Lieutenant Gaddis ("Gaddis") in an effort to avoid getting into any trouble. While he was trying to avoid trouble, he was not trying to hurt Defendant.

Gibson testified--albeit not credibly--that he did not provide Defendant with the name of someone who could eliminate witnesses, but only the name of someone who could advise Defendant about "legitimate investments" such as real estate or mutual funds for his money. Gibson gave Defendant the name of a friend, T. Smith, a member of the Bloods gang, who could serve as a "middleman," ostensibly for handling Defendant's investments.

Gibson and Defendant also discussed the charges pending against Defendant. When asked whether he had prompted those discussions, Gibson replied, "I don't think I've ever asked [Defendant] about his case." When asked whether Gibson "suggested" the murder for hire scheme to Defendant, Gibson answered that he did not. Defendant discussed the murder for hire scheme with Gibson and shared with Gibson the substance of the letter he had written to Hall. Defendant told Gibson he had a person who would contact T. Smith in order to carry out Defendant's plan. Gibson became concerned for T. Smith because he had not had the opportunity to give T. Smith a "heads up."

On December 31, Gibson completed an "inmate request form" which he directed to Gaddis, the shift supervisor at the Bradley County Jail, whom Gibson had come to trust during prior incarcerations. Gibson could not say exactly what he communicated to Gaddis in the inmate request form. Shortly after he passed the inmate request form in, Gaddis pulled Gibson out of the "G-pod"

6

common area, and they had a conversation about Defendant. During this initial face-to-face communication, Gibson explained to Gaddis that he was concerned about how his PIN number was being used and wanted to make sure it was monitored so that nothing would "come back" on him. Gaddis returned Gibson to his cell.

Gaddis did not instruct Gibson to attempt to obtain additional information from Defendant, but he did caution him to be careful. Gibson testified Gaddis never said anything to him about obtaining additional information and he had no further communications with Gaddis. After their conversation, but before the January 5 interview with Jackson and Maskew, Gibson did obtain additional details about Defendant's plans. Gibson already knew what Defendant "wanted," but the new information was more specific and it was corroborated by another inmate with whom Defendant and Gibson shared the G-pod common area. Gibson thought that it was during this time that he saw a letter written by Defendant to Hall.

On January 5, which Gibson described as four or five days after his communication with Gaddis, Gibson was taken out of G-pod to meet with Jackson and Maskew. It was the first time he had spoken with either of them. Gibson relayed the information he learned from Defendant, including information he learned after his conversation with Gaddis. During his interview with Maskew and Jackson, Gibson was asked to listen to Defendant for further information, but Gibson did not learn anything else from Defendant after the January 5 interview because Defendant "got a little paranoid" and their conversations "kind of tailed off."

Gibson had no direct or indirect contact with Jackson or Maskew after the January 5 interview. Gibson tried to contact Maskew again "to ask him if he could check on something," but was unable to do so.

7

### D. Officer Gaddis

Gaddis, the only law enforcement witness with knowledge of his initial contact with Gibson, testified as follows: Gaddis knew Gibson from his "numerous" incarcerations over the last few years. Gaddis did not know how Gibson was assigned to be Defendant's cellmate, but he stated that inmate assignments are based on availability of beds. Contrary to Gibson's testimony, Gaddis testified he had received information from Gibson regarding other inmates on two or three previous occasions. As far as Gaddis knew, Gibson had not been advised or encouraged to pass information to law enforcement in the past. Gaddis instead described Gibson as providing information only when something "could come back and hurt him" (e.g., another inmate planning to hurt an officer). Gibson was not a paid informant.

On this occasion, Gaddis received an inmate request form from Gibson that did not mention Defendant, but did request to speak to Gaddis regarding a matter of "life or death." Gaddis met with Gibson twice, in short succession. In the first encounter, which lasted between 15 and 20 minutes, Gibson told Gaddis he had overheard conversations regarding Defendant's plan to "take care of witnesses" and Gibson stated Defendant offered him $25,000 if he would "do it" or "get it done" after he got out. Gibson indicated he had seen, but had not read, some letters. Within the hour, Gaddis contacted Maskew, and in his second encounter with Gibson, Gaddis reported he had done so and that Maskew might want to talk to Gibson.

Gaddis did not tell Gibson to keep his ears open or to pass along any information to anyone. Gaddis stated it is "not [his] business" to do so, and it is not the jail policy to encourage inmates to try to get information from other inmates. Gaddis did tell Gibson to "be careful" if he chose to pass along information to Maskew. Gaddis was also asked on cross examination the following question:

"But I assume that when you went back into G pod with Mr. Augustin you certainly didn't expect him to not listen or not to obtain other information or, in other words, there was other information that came out, you were aware that Mr. Gibson would be listening to that and obtaining that?" Gaddis answered: "I wasn't -- I assumed he would, yes, sir." [Doc.55 at 138].

### E. Additional Charges

Based at least in part on the investigation prompted by the information supplied by Gibson, a grand jury returned a superseding indictment adding charges of drug trafficking, use of a firearm in drug trafficking, use of the mail to solicit a murder, and several counts of attempting to kill witnesses with the intent to prevent their attendance at trial.

## II. ANALYSIS

Defendant argues that his inculpatory statements were elicited in violation of his Sixth Amendment right to counsel and those statements, as well as any evidence derived from them, must be suppressed. In summary, I **FIND** Defendant did not meet his burden of proof to demonstrate his Sixth Amendment right was violated based on the information gathered by Gibson.

Once a suspect has invoked his Sixth Amendment right to counsel, police may not initiate a custodial interview. *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991). The Sixth Amendment right to counsel attaches "at or after the initiation of adversary judicial criminal proceedings--whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *United States v. Gouveia*, 467 U.S. 180, 188 (1984). It is undisputed that Defendant's Sixth Amendment right to counsel had attached at least as to the kidnapping charges at the time he made inculpatory statements to Gibson. Thus, police could not have lawfully interrogated Defendant about the crimes for which he was already indicted, nor could they have "surreptitious[ly]" employed an agent to "deliberately

9

elicit[]" incriminating statements from him. *Massiah v. United States*, 377 U.S. 201, 206 (1964).

    A.    **Burden of Proof and Fact Findings**

Generally speaking, the proponent of a motion to suppress--the defendant--bears the burden to prove a violation of his constitutional rights. *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) ("It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression). This default allocation of the burden of proof also applies to alleged *Massiah* violations. *See*, *e.g.*, *Kuhlmann v. Wilson*, 477 U.S. 439, 459 (1986) (holding that in order to make out a *Massiah* violation, "the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks"); *Moore v. United States*, 178 F.3d 994, 999 (8th Cir. 1999) (requiring defendant "to show that his right to counsel had attached, that [the informant] was a government agent, and that [the informant] deliberately elicited incriminating statements from him"); *United States v. Bell*, 290 F. App'x 178, 183 (10th Cir. 2008) (defendant could not prevail on Sixth Amendment claim where he "presented no evidence . . . that [the informant] was a government agent"). *See also Maine v. Moulton*, 474 U.S. 159, 176 n.12 (1985) (allowing an inference of police knowledge because "[d]irect proof of the State's knowledge will seldom be available to the accused.").[7]

---

[7] The defendant bears the burden of proof in most Sixth Amendment contexts. *E.g.*, *Strickland v. Washington*, 466 U.S. 668, 687 (1984) (defendant bears burden to establish ineffective assistance of counsel); *United States v. Simms*, 351 F. App'x 64, 67 (6th Cir. 2009) (defendant bears burden to show violation of Sixth Amendment's Notice Clause). There is, however, at least one exception to this rule: if the Government relies on a waiver of the defendant's Sixth Amendment right to counsel, the Government bears the burden to show the right was intentionally relinquished. *Brewer v. Williams*, 430 U.S. 387, 404 (1977).

I **CONCLUDE** Defendant bears the burden to show that his inculpatory statements were "deliberately elicit[ed]" by a government agent and that Defendant did not meet his burden for the reasons set forth herein with respect to any of the three time periods during which he may have communicated with Gibson. With respect to the first time period, the time prior to the initial communications with Gaddis, there is absolutely no evidence that law enforcement enlisted Gibson's assistance. While neither Jackson nor Maskew were able to testify about Gibson's contact with law enforcement during this time period, and even though Gibson's testimony was not entirely credible, Gaddis did testify credibly as to his encounters with Gibson. Specifically, Gaddis testified that his first communication with Gibson regarding this matter was around January 1. While Gibson had relayed information to cover himself in the past, Gibson was not paid, advised, or asked to do so. With no evidence to the contrary, there is no basis to suppress information obtained by Gibson prior to his initial communications with Gaddis regarding this matter. Unfortunately, there is not an entirely clear record of what information Gibson provided during that initial contact. Gaddis credibly testified, however, that Gibson told Gaddis he knew of a plot by Defendant to eliminate witnesses and knew about, but had not yet read, Defendant's letters. Gibson also told Gaddis that Defendant was making calls using his PIN.

As to the latest time period at issue, the time subsequent to the January 5 interview with Jackson and Maskew, I **FIND** no statements from Defendant were obtained by law enforcement through Gibson even though he was told to keep his eyes and ears open. The record does not reflect what, if any, additional evidence was gained by Gibson from Defendant, but it is clear no

11

information was passed on to law enforcement.[8] The testimony of both Maskew and Jackson in that regard was credible and was corroborated by Defendant's second letter to Hall, which indicates Defendant had come to realize Gibson was "working with police."

The closer question involves the information learned by Gibson in the middle time period, the period between his same-day, initial encounters with Gaddis (around January 1) and the January 5 interview with Jackson and Maskew. Again, while not entirely clear, the evidence tends to show Gibson did learn more information during this time period as Gibson testified he became aware of more detailed information, which was corroborated by another inmate.[9] With respect to this middle time period, I credit Gaddis's testimony that he did not instruct Gibson to keep his ears open, but merely told him to be careful. I also credit the testimony of Jackson and Maskew that, prior to the January 5 interview, they did not enlist Gibson's help, nor were they aware that any other law enforcement official had done so. Furthermore, there is no evidence that Gibson received any tangible reward for his assistance. Therefore, with respect to the period of time between the meeting with Gaddis and the interview with Jackson and Maskew, I **FIND** that law enforcement officers did not explicitly ask Gibson to elicit information from Defendant. So finding, however, does not necessarily end the inquiry because Gaddis *assumed* Gibson would learn more information that he might pass along to Maskew or other law enforcement officers after he told Gibson he had contacted Maskew.

---

[8] While Gibson was instructed to keep his eyes and ears open by Maskew and Jackson, there is no evidence Gibson provided information to the Government after his January 5 interview.

[9] There is little evidence presented about what the other inmate learned, but there is no evidence he was working for or with law enforcement.

Although I find that Gibson did learn more detailed information from Defendant after his meeting with Gaddis, the record does not allow a determination of whether Gibson was active or passive in learning that information from Defendant. Defendant did not testify, which leaves only the testimony of Gibson regarding his interactions with Defendant. Gibson testified he did not ever "ask" Defendant about his case, but Gibson's testimony was in some respects not credible. Still, even assuming that Gibson at some point "went along"[10] with Defendant's scheme in order to gain his confidence or learn about his plans, there is no evidence that he did so after the meeting with Gaddis.

### B. The Sixth Amendment and Jailhouse Informants

The Supreme Court has addressed *Massiah*'s effect on the use of jailhouse informants on two occasions, with an intervening case clarifying the first. In *United States v. Henry*, the Court held that where an informant who was "ostensibly no more than a fellow inmate" was acting under instructions as a paid informant for the Government, the statements made by the defendant to the informant while in custody and under indictment were elicited in violation of the defendant's Sixth Amendment rights. 447 U.S. 264, 270 (1980). In the intervening case, the Court reaffirmed that "the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent." *Moulton*, 474 U.S. at 176.

---

[10] According to Jackson, Gibson "went along" with Defendant's scheme and provided Defendant with the name of a contact, ostensibly to help Defendant with his plan to eliminate witnesses. Gibson, however, testified that he provided Defendant with the contact only to help with Defendant's "investments." It appears Gibson willingly assisted Defendant in making contact with a gang member until he came to believe that he would be implicated in a murder for hire scheme since Defendant used his PIN.

13

In both *Henry* and *Moulton*, the Court's analysis turned on the conduct of law enforcement, not the actions of the informant. *See Henry*, 447 U.S. at 270-71 (concluding, based on the arrangement between law enforcement and the informant, that law enforcement "must have known" that the defendant would confide in the informant); *Moulton*, 474 U.S. at 177 (similarly concluding that police "knew" the defendant would make incriminating statements to the informant). However, in neither *Henry* nor *Moulton* was there any argument that the informant was merely a "passive observer" or a "listening post." *Henry*, 447 U.S. at 271; *Moulton*, 474 U.S. at 177 n.13. Both cases, in fact, reserved the question whether a *Massiah* claim could rest on the actions of an informant who "cannot or does not participate in active conversation and prompt particular replies." *Moulton*, 474 U.S. at 177 n.13.

The Court had occasion to answer that question in *Kuhlmann*, 477 U.S. at 459. *Kuhlmann* held that, in order to make out a *Massiah* violation, "the defendant must demonstrate that the police *and* their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Id.* at 459 (emphasis added). The Court reaffirmed that when police are handed information by an informant by "luck or happenstance," there is no violation of the Sixth Amendment. *Id.* (*quoting Moulton*, 474 U.S. at 176).

After *Kuhlmann*, the Sixth Amendment is violated by use of a jailhouse informant after the right to counsel attaches only if: (1) the informant deliberately elicits incriminating statements from the defendant and (2) the informant's actions are attributable to the government--i.e., the informant is acting as a "state agent." *E.g.*, *Horner v. Thaler*, 361 F. App'x 584, 586 (5th Cir. 2010) (*citing Henderson v. Quarterman*, 460 F.3d 654, 664 (5th Cir. 2006)); *Bell*, 290 F. App'x at 183 (*quoting United States v. Johnson*, 4 F.3d 904, 910 (10th Cir. 1993)); *Matteo v. Superintendent, SCI Albion*,

14

171 F.3d 877, 892 (3d Cir. 1999); *Ayers v. Bradshaw*, 2007 WL 2840399, at *8 (N.D. Ohio 2007).

### 1. Are Gibson's Actions Attributable to the Government?

The Government argues the second of these prongs--the "state agent" prong-- is not satisfied. It argues that law enforcement officials are not responsible for Gibson's actions because no one asked Gibson to procure information from Defendant.[11] While not mentioned by the Government, the First, Second, and Eighth Circuits have adopted a "bright line" rule under which an informant is considered a state agent only if the informant was instructed to procure information from the particular defendant. *Ayers*, 2007 WL 2840399, at *24 (acknowledging, but not resolving, a split of authority). On the other hand, the Third Circuit created a "balancing" test for state agency that requires only "some evidence" of agency, which could include "that the informant was 'acting under instructions,' . . . a *quid-pro-quo* for assistance, or past relationship." *Id.* at *24 n.10 (*quoting Matteo*, 171 F.3d at 893-94 (3d Cir. 1999)). The parties have not cited to any cases from the Sixth Circuit Court of Appeals ("Sixth Circuit") adopting the bright line test or the balancing test, and I have found none.[12]

If the bright line rule is applicable, Gibson was not acting as a state agent because he was not instructed to procure information from the Defendant. The Government's argument, however,

---

[11] The Government does not cite to any authority supporting its interpretation of the "state agency" prong of the analysis.

[12] Although not cited by any party, in *United States v. Corona*, 2008 WL 114989 (E.D. Tenn. 2008) (Phillips, J., adopting the Report and Recommendation of Guyton, Magistrate J.), this Court held that "law enforcement must have instructed or requested that the informant obtain information from a particular defendant in order for the informant to be acting as a government agent . . . ." In *Corona*, the defendant sought to establish an agency relationship with evidence only that the informant had previously cooperated with police or entered into a general cooperation agreement. *Id.* at *8.

15

should be viewed in light of the holdings of *Henry* and *Moulton*. In neither of those cases did law enforcement officials ask the informant to elicit information. Indeed, in *Henry*, federal agents instructed the jailhouse informant *not* to question the defendant, but the Court held that the case agent nonetheless "must have known" the informant, who was paid on a contingent basis, would do so. *Henry*, 447 U.S. at 271. As *Moulton* held, whether the government is "responsible for" the actions of an informant depends on whether the government knew or intended that the informant would elicit information, not whether the government explicitly instructed the informant to do so. 474 U.S. at 174, 177.[13] Evidence that the government instructed or paid an informant to obtain information is sufficient to support an inference that the government "knew" or "must have known" the informant would do so, but it is necessary to proceed by such an inference only when "[d]irect proof of the State's knowledge" is unavailable. *See Moulton*, 474 U.S. at 174, 176 n.12.

In the instant case, there is some evidence that the Government knew Gibson would obtain additional information in the middle time period because Gaddis testified he assumed Gibson would obtain more information. Gaddis, furthermore, told Gibson that he had contacted Maskew, who would later be contacting Gibson, and cautioned him to "be very cautious about what he said and did." It is not necessary to determine whether this conduct meets the balancing test for state agency, however, because of my conclusion with respect to the "deliberate elicitation" prong set forth below.

---

[13] While knowledge on the part of law enforcement will support a *Massiah* violation, negligence will not. Neither the Supreme Court nor the Sixth Circuit has ever held that law enforcement officials run afoul of the Sixth Amendment because they "should have known" an informant would elicit incriminating statements. *Alexander v. Smith*, 311 F. App'x 875, 887 (6th Cir. 2009).

## 2. Did Gibson Deliberately Elicit Incriminating Statements?

Even if Gibson's actions during the middle time period are attributable to the Government under these facts, Defendant's suppression motion fails because Defendant has failed to show Gibson deliberately elected information from him. Simply put, Defendant has not met his burden of proof to show Gibson deliberately elicited incriminating statements from him. The line between deliberate elicitation and "mere[] listening" has proven elusive. As *Henry* noted, even subtle prompting may facilitate an incriminating conversation in the jail cell, where "subtle influences" make a defendant "particularly susceptible" to the ploys of an agent posing as a "person sharing a common plight." 447 U.S. at 274. In *Henry*, the informant, who had "some conversations with [the defendant]" that "prod[uced]" incriminating statements, was not a passive listener. *Id.* at 271. In contrast, the informant in *Kuhlmann* remarked that the defendant's initial story "didn't sound too good," but did not ask any questions about the charges. 477 U.S. at 460. Under those facts, the informant was a passive listener; he did not take any steps, "beyond merely listening," designed to elicit incriminating statements. *Id.* at 459. In *United States v. Stewart*, the Sixth Circuit followed *Kuhlmann* to hold that where an informant merely asked the defendant why he had been in jail so long, the incriminating statements that followed were not deliberately elicited. 1991 WL 276255, at *4 (6th Cir. 1991).

Here, the record does not contain any evidence whatsoever that subsequent to his meeting with Gaddis, Gibson actively attempted to procure information from Defendant. Gibson denied "ask[ing]" Defendant about his case at any time, but direct questioning is not necessary to find deliberate elicitation, *see Moulton*, 474 U.S. at 177 n.13 (noting that the informant's acts in *Henry* were "the functional equivalent of interrogation") (cited approvingly on this point in *Kuhlmann*, 477

17

U.S. at 459), and at any rate, Gibson's testimony was not entirely reliable. Given no evidence that Gibson asked or encouraged Defendant to make incriminating statements during the middle time period, however, Defendant has not met his burden to prove Gibson elicited incriminating information from Defendant between his meeting with Gaddis and January 5.

### C. Other Charges

In the alternative, the Government argued in its initial response that there was no violation of the Sixth Amendment because formal charges had not been initiated against Defendant with respect to drug trafficking or witness tampering, and Defendant's Sixth Amendment rights therefore had not attached. *See Texas v. Cobb*, 532 U.S. 162, 172-73 (2001). While not entirely abandoning this attachment argument in its post-hearing submission [Doc. 59], the Government chose not to address it with the citation of any authority or analysis and instead opted to rely on its argument that Gibson was not a state agent. Defendant, with respect to attachment, appears to have conceded that only evidence obtained by Gibson that related to the original indictment, specifically the kidnapping charges, should be suppressed but he failed to specify exactly what information he was seeking to suppress under the evidence presented during the hearing [Doc. 60 at 17-18]. Because I conclude Defendant's inculpatory statements were not deliberately elicited, and because the parties have failed to specifically set forth the applicable facts and argument on the attachment issue, I do not reach this issue.

## III. CONCLUSION

Accordingly, I **RECOMMEND**[14] that Defendant's motion to suppress [Doc. 39] be **DENIED**.

*s/Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[14] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).