UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 1:09-CR-187 |
| v. | ) | |
| | ) | Chief Judge Curtis L. Collier |
| ABRAHAM A. AUGUSTIN | ) | |
| | ) | |

## MEMORANDUM

Before the Court is a motion to suppress filed by Defendant Abraham Augustin ("Defendant"). Defendant seeks to suppress evidence obtained by the Government from Defendant's fellow inmate allegedly in violation of the Sixth Amendment (Court File No. 39). The Court referred the motion to United States Magistrate Judge Susan K. Lee pursuant to 28 U.S.C. § 636(b)(1) (Court File No. 41). Judge Lee held a hearing and, following post-hearing briefs submitted by the parties (Court File Nos. 59, 60), issued a Report and Recommendation ("R&R")(Court File No. 63). Defendant filed timely objections (Court File No. 64) to the R&R and the Government responded (Court File No. 67). For the following reasons, the Court will **ACCEPT** and **ADOPT** the R&R (Court File No. 63) and will **DENY** Defendant's motion to suppress (Court File No. 39).

## I.    RELEVANT FACTS

The Court incorporates those portions of the magistrate judge's recitation of the facts to which objections have not been made, and only recounts the facts underlying the issues addressed in this Memorandum. Defendant was arrested pursuant to a criminal complaint and made his initial appearance on December 10, 2009. A six-count Indictment was returned against Defendant and

Codefendant Lorrance Dais ("Dais") on December 22, 2009, charging Defendant with the kidnapping of Robert Jordan, discharging a firearm during the kidnapping, and unlawful possession of a firearm by a convicted felon (Court File No. 12). Defendant was arraigned on the indictment on January 5, 2010, and remained in custody in the Bradley County Jail in Cleveland, Tennessee, where he had been housed since his arrest on December 10, 2009.

While Defendant was in custody, an inmate, Mark Anthony Gibson ("Gibson"), notified Lieutenant Jason Gaddis ("Gaddis") with the Bradley County Sheriff's Office, he had information concerning a matter of life or death. Gaddis knew of Gibson from prior incarcerations and Gibson had passed on information to Gaddis on a few occasions, essentially, when information "could come back and hurt him" (Court File No. 55 ("Transcript"), p. 128). Gaddis testified at the suppression hearing Gibson was not a "snitch" or "paid informant" and "the only thing that Mr. Gibson had ever give me any information on was something that could possibly cause him problems" (*id.*). In response to his request, Gibson was pulled out of his cell and met face to face with Gaddis. In this meeting, Gibson described Defendant's telephone calls and letters and Defendant's intent to hire someone to eliminate witnesses. Gaddis informed Gibson that he would contact Detective Carl Maskew ("Maskew") with the Bradley County Sheriff's Office, and "for his safety that he needed to be very cautious about what he said and did" (*id*. at 132).

Gaddis contacted Maskew later that same evening and Maskew subsequently arranged a meeting on January 5, 2010, a few days later. At the meeting, Maskew was accompanied by Special Agent Wayne Jackson ("Jackson") with the Federal Bureau of Investigations, the case agent responsible for Defendant's investigation. Neither Jackson or Maskew had ever spoken with Gibson prior to the January 5 meeting. Both Maskew and Jackson testified Gibson was not working as an

2

informant for them or acting at their direction (Transcript, pp. 23-24, 98). Gibson also agreed he had not worked with law enforcement or been acting on orders from Jackson or Maskew prior to this meeting (*id.* at 61-62).

Gibson told Maskew and Jackson about his conversations with Defendant, involving Defendant's drug trafficking and recent kidnapping. Gibson shared a bunk with Defendant and was alone with him in the cell for a significant period each evening. They began communicating because Defendant knew of Gibson's kids. The two cellmates initially discussed "investments" and how Defendant could "invest some money"(Transcript, p. 70). These conversations grew into the elimination of witnesses (*id.*). Gibson provided Defendant with contact information of "a middleman contact to be used for [] investment purpose[s]" (*id.* at 73). Gibson also told Defendant this contact was affiliated with a gang called the Bloods. Gibson allowed Defendant to use his personal identification number ("PIN") number to make phone calls but later worried how this number was being used, growing "concerned about getting into something [he] didn't want to be involved in" (*id.* at 77). Gibson describes his willingness to provide information to law enforcement as "I shared some information I guess to clear myself up" (*id.* at 61).

In the January 5 meeting, Gibson also described a letter Defendant had prepared to an Ashleih Hall ("Hall"), which was basically a confession to the kidnapping. Jackson coordinated with Hall and was able to intercept the letter when it arrived at Hall's home. In his letter to Hall (Government Exhibit 2), Defendant instructs her to pass on another letter in the envelope to a Justine Van Orden ("Van Orden"). The letter to Van Orden (Government Exhibit 1) contains Defendant's specific request for Justine to coordinate with Gibson's contact in the gang to kill the potential witnesses Robert Jordan, Curtis Smith, and Deidre Watkins.

3

A day or two after Gibson's meeting with Jackson and Maskew, Defendant became aware Gibson had spoken with law enforcement. Jackson continued to monitor Defendant's calls and overheard Defendant explaining to Hall that he would be sending her another letter (Transcript, p. 25). In the second letter (Defendant's Exhibit 1), Defendant indicates he knows Gibson is "working with the police" and asks Hall to call Van Orden and tell her to refrain from calling Gibson's contact. Defendant sent a third letter to Hall (Defendant's Exhibit 2), in which he asks Hall to remind Van Orden not to make contact with Gibson's person and also warns Hall Defendant will have her killed if she deceives him.

Neither Jackson nor Maskew communicated with Gibson about Defendant after the January 5 meeting. Although Jackson considered recording conversations between Gibson and Defendant, this never occurred because the two men were put in separate cells after some type of conflict occurred. Thus, the only information Jackson or Maskew obtained from Gibson occurred at the January 5 meeting. Gibson made attempts to contact Maskew after the meeting, but to no avail. In a letter to Maskew, Gibson indicates he's "continued to observe and monitor [Defendant]'s actions" and Gibson was "sorry [he] couldn't complete what we had planned" (Defendant's Exhibit 3). Gibson suggests another inmate who may have gained the confidences of Defendant as he feels "it's [his] duty to find another avenue to accomplish our mission" (*id.*). No further communications occurred between Gibson and either Maskew or Jackson.

Based in part on the information obtained from Gibson, as well as Defendant's telephone conversations and intercepted letters, a grand jury returned a superseding indictment. In the superseding indictment, Defendant is additionally charged with use of the mail with the intent murder be committed, attempted murder of witnesses with an intent to prevent their attendance and

testimony at trial, attempting to obstruct and impede an official proceeding, use of a firearm in furtherance of a drug trafficking offense, and possession with intent to distribute cocaine (Court File No. 28).

## II.     STANDARD OF REVIEW

This Court must conduct a *de novo* review of those portions of the report and recommendation to which objection is made and may accept, reject, or modify, in whole or in part, the magistrate judge's findings or recommendations.  28 U.S.C. § 636(b)(1)(C).  The Court has "broad discretion" in conducting a *de novo* determination and is not required to rehear any contested testimony.  *United States v. Raddatz*, 447 U.S. 667, 674, 681 (1980).  "Congress intended to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on the magistrate's proposed findings and recommendations." *Id.* at 676.

## III.     ANALYSIS

Defendant moved to suppress evidence under the Sixth Amendment, claiming his statements to Gibson, as well as any evidence obtained from them, must be suppressed.  Judge Lee recommended the motion to suppress be denied.  Defendant timely objected to the findings in the R&R, arguing he has met his burden of proof (1) establishing Gibson was a government agent and (2) his inculpatory statements were deliberately elicited by Gibson and were obtained in violation of his Sixth Amendment right to counsel.

Defendant bears the burden of proof when seeking suppression of evidence and must "display a violation of some constitutional or statutory right justifying suppression." *United States*

*v. Feldman*, 606 F.2d 673, 679 n. 11 (6th Cir. 1979).  The Sixth Amendment to the United States Constitution provides, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defen[s]e."  U.S. Const. amend. VI.  This right to counsel attaches after "adversary judicial proceedings" have been initiated, which the United States Supreme Court has defined to include an indictment.  *See United States v. Gouveia*, 467 U.S. 180, 187-88 (1984) (quoting *Kirby v. Illinois*, 406 U.S. 682, 688-89 (1972)).  Once the Sixth Amendment right to counsel has attached for a particular charge, law enforcement officials may not use as evidence incriminating statements deliberately elicited from the accused without the presence or waiver of counsel.  *See Maine v. Moulton*, 474 U.S. 159, 176 (1985).

Because Defendant's right to counsel had undisputedly attached for the kidnapping charges, it would be a Sixth Amendment violation if an agent of the government "deliberately elicited" incriminating statements from Defendant by way of a "secret interrogation."  *Massiah v. United States*, 377 U.S. 201, 205-06 (1964); *Moulton*, 474 U.S. at 176.  However, "the Sixth Amendment is not violated whenever-by luck or happenstance- the State obtains incriminating statements from the accused after the right to counsel has attached."  *Moulton*, 474 U.S. at 176 (citing *United States v. Henry*, 447 U.S. 264, 274 (1980)).  A defendant does not make out a violation of his Sixth Amendment right "simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police."  *Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986).    In order to establish a violation, Defendant must first show Gibson was a government agent and "police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Id.*  The Court finds any incriminating statements made by Defendant should not be suppressed because the record does not support finding Gibson was a

government agent nor is there evidence the statements were deliberately elicited.

Defendant has failed to establish Gibson was acting as a government agent at any point in time when the incriminating statements were obtained. As discussed in *United States v. Corona*, No. 3:05-CR-148, 2008 WL 114989 at * 1,9 (E.D. Tenn. Jan. 10, 2008), the Sixth Circuit has not articulated a test for determining whether an inmate has become a government agent under *Massiah*. In *Corona*, the court found there to be insufficient evidence to establish agency based on the inmates' general cooperation agreement or past assistance and adopted the "bright-line" test for agency. *Id.* at *1. This bright-line test, adopted by the majority of circuits, requires law enforcement to have instructed the informant to obtain information about a defendant in order to establish agency.[1] The Third Circuit applies a balancing test and in addition to specific instructions from law enforcement, weighs factors such as past relationships, and the informant's motivation for a quid pro quo agreement, ultimately seeking "some evidence" of an agency relationship. *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 894-95 (3d Cir. 1999).

Under either a bright-line or a balancing test, Defendant has not demonstrated Gibson was a government agent. There is no evidence any member of law enforcement specifically instructed Gibson to obtain information from Defendant. There is no indication in the record Gibson's assignment to Defendant's cell was anything other than a random designation. Jackson and Maskew had never met or communicated with Gibson prior to the January 5 interview and they obtained no

---

[1] *See, e.g., United States v. LaBare*, 191 F.3d 60, 65-66 (1st Cir. 1999); *United States v. Whitten*, 610 F.3d 168, 193 (2d Cir. 2010); *United States v. McFadden*, 187 F. App'x 290, 294 (4th Cir. 2006); *United States v. York*, 933 F.2d 1343, 1356 (7th Cir. 1991) *overruled on other grounds Wilson v. Williams*, 182 F.3d 562 (7th Cir. 1999); *United States v. Johnson*, 338 F.3d 918, 922-23 (8th Cir. 2003); *Stano v. Butterworth,* 51 F.3d 942, 946 (11th Cir. 1995); *United States v. Watson*, 894 F.2d 1345, 1347 (D.C. Cir. 1990).

information from Gibson after this meeting. Although Gibson may have offered information on a few occasions to Gaddis in the past, there is no indication he was advised or encouraged to do so. As Gaddis stated, "[h]e would give me information that could come back and hurt him." In Gaddis's initial conversation with Gibson, he told Gibson "be careful if he chose to do anything with the marshals, or with Officer Maskew" and "he needed to be very cautious about what he said and did" but never told or asked him to pass on information. Gaddis may have "assumed" Gibson would be listening to any other possible information from Defendant, but did not direct or instruct him to do so. Gaddis's bare assumption, without more does not establish an agency relationship. *See Kuhlmann*, 477 U.S. at 459 ("the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks."). Also, Gibson testified he did not receive any benefit nor did he expect to receive any benefit for providing this information.

Defendant acknowledges the absence of direct evidence Gibson was a government agent and urges the Court to instead find his burden of proof has been established by circumstantial evidence (Court File No. 65, p. 2). Defendant's cites the magistrate judge's questions as to Gibson's credibility, Gibson's random assignment to Defendant's cell, Gaddis's prior encounters with Gibson, and Gibson's allowing Defendant to use his PIN number in support of his argument. Although the magistrate judge did note issues with Gibson's credibility, the testimony from Jackson, Maskew, and Gaddis undisputedly establishes Gibson was not directed to obtain information prior to the January 5 meeting. Following this meeting, neither Jackson nor Maskew obtained any information from Gibson. It is unclear what motivated Gibson to initially provide Defendant with his PIN number to make telephone calls, but this decision eventually prompted him to contact Gaddis.

8

Absent any indication Gibson was instructed to obtain information from Defendant or any evidence the government controlled Gibson's interaction with Defendant, the record does not support a finding Gibson was acting as a government agent. *See, e.g., Alexander v. Smith*, 342 F. Supp.2d 677, 688 (E.D. Mich. 2004) (collecting cases).

Defendant similarly fails to demonstrate statements made to Gibson were deliberately elicited. After Gibson's first contact to Gaddis, Gaddis did "assume" Gibson would continue to listen to statements made by Defendant. However, merely continuing to listen falls short of deliberately eliciting a statement. Unlike the informant in *Moulton*, who repeatedly asked the defendant to remind him of details previously discussed, encouraging the defendant to describe his plans, the record reflects no active attempts by Gibson to engage Defendant in incriminating testimony prior to the January 5 meeting with Jackson and Maskew. After this meeting, Gibson provided no further information to law enforcement. The Court finds the record supports the magistrate judge's conclusion Gibson did not deliberately elicit incriminating testimony.

## IV.    CONCLUSION

The Court agrees with the magistrate judge's thorough analysis and concludes Gibson was not acting as a government agent and did not deliberately elicit information from Defendant  in violation of the Sixth Amendment. Accordingly, the Court will **ACCEPT** and **ADOPT** the Report and Recommendation  (Court File No. 63) and will **DENY** Defendant's motion to suppress (Court File No. 39).

An Order shall enter.

/s/
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**